**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 17 2012, 9:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KATHERINE A. HARMON**
Mallor Grodner, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**SHANNON D. LANDRETH**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE: THE PATERNITY OF T.P., | ) |
| | ) |
| | ) |
| R. L., | ) |
| | ) |
|     Respondent, | ) |
| | ) |
| | ) |
|       And | )    No. 06A01-1202-JP-38 |
| | ) |
| W. M., | ) |
| | ) |
|     Appellant-Intervenor, | ) |
| | ) |
|       vs. | ) |
| | ) |
| B. P., | ) |
| | ) |
|     Appellee-Petitioner. | ) |

APPEAL FROM THE BOONE CIRCUIT COURT
The Honorable Matthew C. Kincaid, Special Judge
Cause No. 06C01-0002-JP-86

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-Intervenor W.M. (Stepmother) appeals the trial court's judgment in her third-party custody action against appellee-petitioner B.P. (Father). Specifically, Stepmother argues that the trial court erred in 1) granting Father's discovery protective order; 2) finding she did not meet her burden to pursue third-party custody of her stepdaughter (T.P.); and 3) ordering her to pay Father's attorney $5,000. Concluding that the trial court did not err in granting Father's discovery protective order or in finding that Stepmother did not meet her burden to pursue third-party custody of T.P., we affirm the trial court in part. However, we reverse the award of attorney fees.

## FACTS

Stepmother and Father met in May 1999. Father's daughter, T.P., was born out of wedlock in December 1999. Father established paternity of T.P. shortly after her birth and began visitation with her in May 2000. The visits occurred at Stepmother's house where Father was living. Because T.P.'s biological mother abused alcohol, Father filed a petition seeking custody of T.P. in October 2001. Father and Stepmother were married in January 2002, and the trial court granted Father custody of T.P. in March 2003. Biological mother's parenting time was limited to two supervised visits per week for two hours.

During the parties' marriage, Father was a firefighter who worked a twenty-four hour shift every third day. On the days that Father worked, Stepmother, who works at Eli Lilly and Company, took care of T.P. Specifically, Stepmother woke T.P. up in the morning, fed her breakfast, took her to day care or school, picked her up from day care or school, helped her with her homework, and took her to her extracurricular activities, which included dance and gymnastics classes as well as swimming lessons.

Stepmother was also very active at T.P.'s school. Father told the school that Stepmother functioned in the role of T.P.'s mother, and Stepmother participated in a variety of parent volunteer activities. She also attended annual parent-teacher conferences. T.P. and Stepmother spent weekends together going shopping, having lunch, and going to Pilates. They played games, rode bicycles, and went to movies. They also attended birthday parties, play dates, and dinners together.

In addition, Stepmother contributed towards T.P.'s financial support. Stepmother, Father, and T.P. lived in the home that Stepmother had purchased prior to the marriage. T.P. was on Stepmother's health insurance policy. Stepmother also paid for two years of T.P.'s dance and gymnastics classes. In addition, Stepmother made a contribution to the parish where T.P. attended school and purchased clothing for T.P.

When T.P.'s biological mother died in August 2010, Stepmother asked Father if she could adopt ten-year-old T.P. Father, however, refused to allow it. In March 2011, Father took T.P. to see Cynthia Hunter, a licensed metal health counselor. Hunter met individually with Stepmother, Father, and T.P.

3

Stepmother filed a dissolution petition in April 2011. Father and T.P. moved out of Stepmother's home in May 2011. Thereafter, Father refused to allow T.P. to see or speak to Stepmother. Father also told the administration at T.P.'s school not to have any further contact with Stepmother.

On June 21, 2011, Stepmother filed a Motion to Intervene in the pending action in the Boone Circuit Court, which had jurisdiction over T.P's care, custody, and parenting time. Stepmother also filed a Verified Petition for Stepparent Parenting Time and for a Custody and Parenting Time Evaluation. On June 30, 2011, Father filed objections to Stepmother's motion and petition. Following a hearing, the trial court granted Stepmother's motion to intervene.

Father filed a Request for Determination of De Facto Custodian Status of Intervenor and Request for Determination of Intervenor's Right to Visitation with Non-biological Child asking the trial court to conduct a bifurcated hearing on the issues of Stepmother's status and relief. Stepmother filed a response, and on August 30, 2011, the trial court issued the following order setting the parameters for the first hearing:

> To be considered for custody, Stepmother must prove she is a de facto custodian of T.P. or that, as a third party who is not a de facto custodian, there is clear and convincing evidence to rebut the presumption that Father should have custody of T.P. If she can prove either of these things, a subsequent hearing would be set to determine who should have custody of T.P. To be considered for court ordered visitation, Stepmother will have to show she has a custodial and parental relationship and that, if she proves the same, a subsequent hearing will be set to determine whether visitation is in T.P.'s best interests.

Appellant's App. p. 97-98.

On September 19, 2011, Stepmother served Father with fifty-two interrogatories, fourteen requests for admissions, and nine requests for production of documents. In response, Father filed a Request for a Discovery Protective Order wherein Father stated that the interrogatories, requests for admissions, and requests for production of documents were not important to the resolution of the status issues to be determined at the upcoming hearing. Following a hearing on Father's request, the trial court granted the protective order in part and denied it in part. Specifically, the trial court explained as follows:

> On October twenty-six, 2011 we're trying two issues one is [Stepmother] a de facto custodian, two if she is not a de facto custodian, is there a parental bond which will support third party visitation. Those are the only two issues for trial on October twenty-six. So a large measure of discovery is unnecessary, not reasonably calculated to lead to admissible evidence and quite a large amount of it is going to be the subject of a protective order. So listen carefully as I announce the interrogatories, request for production and request for admissions that will be responded to.

Appellant's App. p. 74. On October 17, 2011, Father filed a Request for In Camera Interview asking the trial court to interview T.P. in chambers because T.P., a mature and well-spoken twelve-year-old, had expressed her desire to speak to the court.

On October 26, 2011, the trial court held the hearing on Stepmother's status. Testimony at the hearing revealed that Father has been a concerned and involved presence in T.P.'s life since she was born. He established paternity of T.P. shortly after her birth and visited her regularly when she was an infant. Father then obtained custody of T.P. when she was three years old. He chose the parochial school that T.P. attends and

5

pays for the tuition. Like Stepmother, Father has been actively involved in T.P's school. For example, he tutored second graders several times a week in math and spoke to the 5th grade class at an awards ceremony. Father was one of the few parents in T.P.'s school that previewed a sex education video before it was shown to the class.

Further, in addition to paying for T.P.'s tuition, Father pays for her summer camps, dance lessons, and swim team. Father takes T.P. to birthday parties and to and from school on his days off. Father regularly helps T.P. with her homework and also helped her to prepare her First Communion Reading. He takes her to both well and sick child doctor appointments, routinely helps her pick out her Halloween costume, and bought the computer, desk, and chair in her bedroom. In addition, Father and T.P. have a good night ritual.

Also at the hearing, therapist Cynthia Hunter testified that when she began seeing T.P. in March 2011, before T.P. and Father moved out of Stepmother's house, T.P. was suffering from anxiety and depression. Seven months later, after T.P. and Father had moved into their own house, T.P. presented herself as a relaxed and carefree child who enjoys life. Hunter explained that Father told her that he wanted to do what was in T.P.'s best interest regarding Stepmother, and would allow Stepmother visitation with T.P. if that was best for T.P. According to Hunter, however, it would be harmful for T.P. to visit with Stepmother because T.P. is afraid of Stepmother and does not want to have contact with her. Hunter further explained that T.P. and Father enjoy a close and loving relationship, and that T.P. is flourishing in his care.

When the first day of the hearing ended, Father had not completed his presentation of evidence. The trial court gave Father one and one-half hours at a later date to conclude his evidence. The following day, October 27, 2011, the trial court interviewed T.P. in chambers. During the interview, T.P. told the judge that she believed that Stepmother attempted to buy her love. She explained that at the end of the parties' marriage, Stepmother called Father "the most vile disgusting person she had ever met." Tr. p. 386. T.P. was upset that Stepmother had insulted Father. The trial court asked T.P. several times whether she wanted to see Stepmother and if she was trying to make Father happy by saying that she did not want to see Stepmother. T.P. repeatedly responded that although she had loved Stepmother in the past, she did not want to see her.

On November 15, 2011, the trial court held an attorney conference and scheduled the conclusion of the hearing for December 13, 2011, and January 23, 2012. Two days later, on November 17, 2011, Father filed a motion for Judgment on the Evidence, which essentially asked the trial court to rule on the evidence before it without holding the already scheduled hearings in December 2011 and January 2012. In this motion, Father stated that Stepmother had failed to overcome the presumption that Father should have custody of his child and to establish that she was T.P.'s de facto custodian or that she had a custodial and parental relationship with T.P. Father asked the court to deny Stepmother's request to establish de facto or third-party custodian status and deny her request for visitation.

Two weeks later, on December 1, 2011, the trial court entered an order finding that Stepmother did not meet her burden to pursue third-party custody, but did meet the burden of proving she had a custodial and parental relationship with T.P. Specifically, the order provides in relevant part as follows:

### Custody – Denied

The Court FINDS and CONCLUDES that [Stepmother] was never the de facto custodian . . . . She was a caregiver, but not "the primary caregiver." There is, the Court FINDS and CONCLUDES no evidence, clear, convincing, or otherwise that [Father] is unfit to parent and that [Stepmother] as a third party ought to have custody. . . .

The Court has enough evidence before it. A custodial evaluation would be unduly burdensome. Further presentation, litigation, hearing, witnesses would have no possibility of demonstrating otherwise. By permitting the same, this Court would be sanctioning a futile and expensive battle with no benefit to T.P. [Stepmother's] request for custody lacks merit and should be denied.

Appellant's App. pp. 22-23.

### Visitation – Granted

There is no question that [Stepmother] played a major role in [T.P.'s] life. . . . The Court does not perceive a danger to [T.P.] in seeing [Stepmother] under some strict conditions initially, which _may_ after some review merit loosening over time. (Or, at a review hearing the Court may conclude that visitation should be terminated.)

Now, the Court sees more danger in the long-term if [T.P.] does not see [Stepmother] on a limited basis. The last year has been a transitional and difficult period for [T.P.] The Court is concerned about the long-term ramifications for suddenly breaking off this relationship with [Stepmother]. The Court is concerned that the decision by [T.P.] not to want to see [Stepmother] is being made while the emotional pain of many factors remains.

Since [Stepmother] had a substantial parental relationship with [T.P.] and . . . thus has standing to seek to visit with her, what the Court concludes would be in the best interest of [T.P.] would be for [T.P.] to

invest a little time with [Stepmother] now in the interest of not regretting a decision to become estranged from her in the future when the relationship could be irreparable. . . .

If this Court were to sanction a "clean break," it might deprive [T.P.] of some valuable emotional growth and good mental health. Absent a true danger to a person from continued contact, it isn't healthy to break off familial relationships suddenly and with rigidity. . . . If a person habitually freezes out such people, it is ultimately an unhealthy and unhappy way of living. . . .

But the contact is going to be limited, controlled, and specific. . . . The contact is going to be limited such that there be no interference with this good and competent father's efforts to single-parent his daughter.

With an eye towards the best long term interests of [T.P.] and with the concern about ongoing litigation cost, duration and the impact upon [T.P.], the Court FINDS that an order of some limited visitation is appropriate.

Appellant's App. p. 22-26.

Orders

Judgment in favor of [Father] and against [Stepmother] on her claim for custody of [T.P.] is GRANTED. [Stepmother's] petition for custody of [T.P.] is DENIED.

[Stepmother] SHALL have supervised visitation with [T.P.]. It SHALL be supervised by the Boone County Guardian Ad Litem under supervision and direction of Kandi Killin or her designee. . . .

[Stepmother] and [T.P.] SHALL meet in a public place. The GAL or designee SHALL observe the interaction and note anything significant. The GAL SHALL talk with [T.P.] after the visit and assess her views and outlook. . . .

Unless the Court orders otherwise by some subsequent order, visits 1-4 SHALL be thirty minutes in duration. Visits 5-8 SHALL be 45 minutes in duration. Visits 9-12 SHALL be one hour. . . .

The visits SHALL occur one time per week Monday through Sunday. . . .

A review hearing is set for March 6, 2012 at 9:00 a.m. Parties, counsel and the GAL SHALL attend. . . .

At the review hearing, the Court will address whether further visitation should be afforded and under what circumstances and or conditions it should occur.

Considering all equitable factor[s] in the allocation of attorney's fees including but not limited to (1) the merits of the claims and defenses; (2) the necessity of assuring equivalent counsel considering the parties' differing means; (3) noting that at least ten hours have been spent in court by [Father] and his attorneys and a like number of hours, at least, must have reasonably been spent outside of court (4) that not less than $250.00 per hour is a reasonable hourly rate in this geographical locale the Court ORDERS that [Stepmother] SHALL PAY  $5,000.00 to Father's attorney. . . .

Further hearings on the issues raised in the pleadings and motions filed to date are MOOT and therefore are VACATED except insofar as the hearing on the same previously set March 6, 2012 at 9:00 a.m. is converted to a status on visitation as herein described.

This Judgment is FINAL.  There is no just cause to delay its enforcement.

Appellant's App. p. 26-28.

On December 27, 2011, Father filed a Motion to Correct Errors wherein he renewed his objection to [Stepmother] exercising visitation with [T.P.] Stepmother filed a Motion to Correct Errors and Response to Father's Motion to Correct Errors wherein she argued that the trial court erred in granting Father's discovery protective order, finding she had not met her burden to pursue custody of T.P., and ordering her to pay Father's attorney $5,000.  The trial court denied both motions and appointed a Guardian Ad Litem.

On February 1, 2012, Stepmother timely filed a Notice of Appeal.  One week later, the GAL filed a status report with the trial court explaining that during the first four supervised visitations, T.P. refused to engage in conversation with Stepmother.  Rather, T.P. sat with her head down and eyes closed.  T.P. told Stepmother that she did not want to see her and wanted her out of T.P.'s life.  According to the GAL, it appeared that T.P.

10

had been coached and encouraged to be disrespectful to Stepmother. The GAL further explained that Stepmother was very restrained and appropriate. Specifically, Stepmother told T.P. that no matter how T.P. acted, Stepmother would always love her. After receiving the GAL's status report, on February 13, 2012, the trial court increased the duration of the visits to three hours each and ordered T.P. to be polite. Father was ordered not to coach T.P. The trial court also ordered the GAL to share the contents of the order with T.P.

On February 27, 2012, Father requested a stay of the trial court's judgment pending resolution of the appeal, which the trial court denied. On March 6, 2012, the trial court held an evidentiary hearing to review the temporary visitation arrangement. The trial court judge also met with T.P. The record of proceedings in the appeal before us does not include transcripts of the March 6 hearing or of the trial court's meeting with T.P. Following the hearing, the trial court concluded that it was "in the best interest of [T.P.] that the Court shall order no further visitation be required of [T.P.] with [Stepmother]." Appellee's App. p. 35. The order further stated that this was a final judgment. Stepmother did not appeal this order.

The appeal before us concerns the trial court's December 1, 2011, order which granted Stepmother visitation with T.P., found she had not met her burden to pursue custody of T.P., and ordered Stepmother to pay Father's attorney $5,000.

## DISCUSSION AND DECISION

As a preliminary procedural matter, Father argues that this appeal should be dismissed as moot because Stepmother did not appeal the trial court's March 6, 2012, order finding that it was not in T.P.'s best interests to have visitation with Stepmother. Father has waived this issue because he had failed to provide adequate citation to authority in his two-page argument. See Mallory v. State, 954 N.E.2d 933, 936 (Ind. Ct. App. 2011) (stating that a party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record).

Waiver notwithstanding, we find no error. This Court has jurisdiction in all appeals from final judgments. In re Adoption of S.J., 967 N.E.2d 1063, 1064 (Ind. Ct. App. 2012) (citing Ind. Appellate Rule 5(A)). Here, the trial court specifically stated that the December 1 order was a final judgment. It was therefore appealable, and Stepmother timely filed her Notice of Appeal. The trial court also stated that the March 6, 2012 order was a final judgment. Stepmother could therefore have appealed that order as well but she was not required to do so and chose not to. Mother's appeal is not moot, and we decline to dismiss it. We now turn to the merits of the appeal.

### I. Discovery Protective Order

Stepmother first argues that the trial court erred in granting Father's Discovery Protective order. We accord great deference to the trial court's discovery decisions and will reverse only when the trial court has abused its discretion. Turner v. Boy Scouts of

12

America, 856 N.E.2d 106, 112 (Ind. Ct. App. 2006). Id. An abuse of discretion occurs when the trial court's decision is against the logic and circumstances of the case. Id.

The purpose of discovery rules is to provide the parties with information essential to the litigation of the issues and to promote settlements. M.S. ex rel. Newman v. K.R., 871 N.E.2d 303, 311 (Ind. Ct. App. 2007). A party may obtain discovery regarding any matter relevant to the subject matter of the case, or which appears reasonably calculated to lead to the discovery of admissible evidence. Turner, 856 N.E.2d at 112.

Here, Stepmother initially served Father with fifty-two interrogatories, fourteen requests for admissions, and nine requests for production of documents. Stepmother subsequently amended the interrogatories and reduced them to twenty-eight with subparts. The trial court explained that the parties would be trying two issues. Those issues were whether Stepmother was a de facto custodian and whether there was a parental bond that would support third-party visitation. According to the trial court, a large measure of Stepmother's discovery was not reasonably calculated to lead to admissible evidence and would therefore be the subject of a protective order.

We have reviewed the interrogatories, requests for admissions, and requests for production of documents. The trial court is correct that many of the requests, such as questions regarding Father's job, residence, communication with schools, counseling sessions, and other decisions regarding T.P., simply were not calculated to lead to admissible evidence as to whether Stepmother was a de facto custodian and whether she had a parental and custodial relationship with T.P. Further, many of Stepmother's other

13

discovery requests, such as a description of her relationship with T.P., a list of times T.P. was left in her care, and a list of her contributions towards T.P.'s care were merely cumulative of evidence Stepmother presented at the hearing.

Because many of Stepmother's discovery requests were either not reasonably calculated to lead to admissible evidence or cumulative of Stepmother's testimony, the trial court did not err in granting Father's discovery protective order.

## II.  Visitation and Custody

At the outset, we note our preference for granting latitude and deference to trial court judges in family law matters.  Kirk v. Kirk, 770 N.E.2d 304, 307 (Ind. 2002).  The Indiana Supreme Court explained the reason for this deference in Kirk:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

Id. (quoting Brickley v. Brickley, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). Therefore, on appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal.  Id.  We now turn to the issues in this case.

## A.  Visitation

14

Before the October hearing, the trial court explained that to be considered for court-ordered visitation, Stepmother would have to show she had a custodial and parental relationship with T.P.[1] If she proved that, the trial court explained that it would set a subsequent hearing to determine whether visitation was in T.P.'s best interests. Following the hearing, the trial court concluded that Stepmother met her burden of showing she had a substantial parental relationship with T.P. Finding another hearing on this issue unnecessary, the trial court also concluded that it would be in T.P.'s best interests to visit with Stepmother. Specifically, the trial court explained that it was concerned about the long-term ramifications of T.P. breaking off the relationship with Stepmother even though T.P. told the court she did not want to visit Stepmother and the therapist testified it would be harmful for T.P. to visit with Stepmother. With this testimony in mind, the trial court scheduled supervised visitation in a public place. Following a March 6, 2012 review hearing, the trial court, concluded that it was in the best interests of T.P. to discontinue visitation.

Stepmother now argues that the trial court "improperly addressed the best interests of the child in violation of its own order." Appellant's Br. p. 22. She asks us to reverse and remand this issue to the trial court for a hearing on what amount of visitation would

_____

[1] To establish visitation, a third person must show that a custodial and parental relationship exists and that visitation with the third person would be in the best interests of the child. Hughes v. Banning, 541 N.E.2d 283, 284 (Ind. Ct. App. 1989). The party seeking visitation rights bears the burden of establishing the threshold requirement of the custodial and parental relationship. Id. The mere protest of a parent who asserts that visitation by another person would somehow harm his or her child should not be enough to deny visitation in all cases. Id. This is especially true where the third person has cared for the child as his or her own. Id.

15

be in T.P.'s best interests. However the trial court awarded Stepmother the relief she is now seeking in its December 1, 2012, order when it concluded that weekly supervised visitation was in T.P.'s best interests. We further note that in its March 6, 2012, order, the trial court concluded that it was in T.P.s best interests to discontinue visitation. Stepmother did not appeal this order. Any visitation issue is therefore unavailable. See McDillon v. N. Ind. Pub. Serv. Co., 812 N.E.2d 152, 157 (Ind. Ct. App. 2004), affirmed in part and vacated in part on other grounds, McDillon v. N. Ind. Pub. Serv. Co., 841 N.E.2d 1148 (Ind. 2006) (stating that Court of Appeals would not consider argument where NIPSCO failed to perfect an appeal pursuant to Indiana Appellate Rule 9).

## B. De Facto Custodian

Stepmother also contends that the trial court erred in finding that she was not T.P.'s de facto custodian. Before custody can be awarded to a third party, that third party must demonstrate de facto custodian status by clear and convincing evidence. A.J.L. v. D.A.L., 912 N.E.2d 866, 870 (Ind. Ct. App. 2009) (citing Ind. Code § 31-17-2-8.5). In reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing, but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. Id.

16

Indiana Code section 31-9-2-35.5 (2007) defines de facto custodian in relevant part as follows:

> De facto custodian . . . means a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least … one (1) year if the child is at least three (3) years of age.

> Any period after a child custody proceeding has commenced may not be included in determining whether the child has resided with the person for the required minimum period.

Here, our review of the evidence reveals that although Stepmother was clearly a caregiver for T.P. and clearly provided financial support to T.P., Stepmother was not the primary caregiver or provider of financial support. This is because Father has been a concerned and involved presence in T.P.'s life since she was born. He established paternity shortly after she was born and obtained custody of her when she was three years old. He chose the parochial school that T.P. attends, pays for the tuition, and is an active volunteer. Father also pays for T.P.'s summer camps, dance lessons, and swim team. He takes her to birthday parties and to and from school on his days off. Father regularly helps T.P. with her homework and also helped her prepare her First Communion reading. He takes her to both well and sick child doctor appointments, routinely helps her pick out her Halloween costume, and bought the computer, desk, and chair in T.P.'s bedroom. This evidence supports the trial court's conclusion that Stepmother was not a de facto custodian, and we find no abuse of the trial court's discretion.

C. Presumption in Favor of the Natural Parent

17

Stepmother further argues that the trial court erred in concluding that she did not rebut the presumption that favors awarding custody of a child to the natural parents. Before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. Paternity of T.P., 920 N.E.2d 726, 731 (Ind. Ct. App. 2010), trans. denied. The presumption that favors awarding custody of a child to the natural parents will not be overcome simply because a third party could provide the better things in life for a child. Id.

In a proceeding to determine whether to place a child with a person other than the natural parent, the court may consider the natural parent's (1) unfitness; (2) long acquiescence in the third party's custody of the child; or (3) voluntary relinquishment of the child such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. Id. However, the trial court is not limited to these criteria. Id. At issue is whether the important and strong presumption that a child's interests are best served by placement with the natural parents is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. Id. at 731-32. This determination rests within the sound discretion of the trial court, and its judgment must be afforded deferential review. Id. at 732.

Here, our review of the evidence reveals that when T.P. began seeing the therapist in March 2011, before she and Father moved out of Stepmother's house, T.P. was

18

suffering from anxiety and depression. Seven months later, after Father and T.P. had moved into their own house, T.P. presented herself as a relaxed and carefree child who enjoys life. T.P. and Father enjoy a close and loving relationship, and T.P. is flourishing in Father's care. Recognizing our deferential review, this evidence supports the trial court's conclusion that Stepmother has not rebutted with clear and convincing evidence the presumption that Father should have custody of T.P.

### III. Attorney Fees

Lastly, Stepmother argues that the trial court erred in sua sponte ordering her to pay Father's attorney $5,000. The decision to award attorney fees and the amount of the award are reviewed for an abuse of discretion. Allen v. Proksch, 832 N.E.2d 1080, 1102 (Ind. Ct. App. 2005). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. Id. Indiana follows the American Rule, which ordinarily requires each party to pay his or her own attorney fees. Id. Generally, attorney fees are not recoverable from the opposing party as costs, damages, or otherwise, in the absence of an agreement between the parties, statutory authority, or rule to the contrary. Id.

Indiana Code section 31-17-7-1 provides that a trial court "periodically may order a party to pay a reasonable amount of the cost to the other party of maintaining or defending [a custody proceeding] and for attorney's fees . . . ." When determining whether or not to award attorney fees, a trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful

19

employment and to earn adequate income, and such other factors as bear on the reasonableness of the award. Bertholet v. Bertholet, 725 N.E.2d 487, 501 (Ind. Ct. App. 2000).

Here, Stepmother argues that the trial court abused its discretion in ordering her to pay $5,000 to Father's attorney because the trial court did not consider the resources of the parties or the ability of the parties to pay attorney fees and did not set forth any basis for the award of fees. Allen, 832 N.E.2d at 1080 and Bertholet, 725 N.E.2d at 487 are both instructive.

In Allen, the trial court ordered Grandmother to pay $4,500 of Father's attorney fees. During the custody hearing, Father testified that he made $12.50 per hour and spent over $8,000 in attorney fees, and Grandmother testified that she worked part-time in her husband's business. However, the trial court did not hold an evidentiary hearing on the attorney fee issue, and there is no indication that the court considered the parties' resources, economic condition, or other factors that would bear on the reasonableness of the award of attorney fees. We concluded that the trial court abused its discretion in failing to hold an evidentiary hearing to consider these issues and reversed the award of attorney fees. Id. at 1103.

In Bertholet, Husband appealed the trial court's sua sponte order that he pay Wife's appellate attorney fees following an appeal bond hearing. This Court explained that when assessing attorney fees, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful

20

employment and to earn adequate income, and such other factors as bear on the reasonableness of the award. Id. at 501. Our review of the record reveals there was some evidence before the trial court that suggested an award of fees to Wife may have been reasonable because at the time of the appeal bond hearing wife was unemployed, had no income, and was going to lose her car. Id. However, because the trial court failed to hold an evidentiary hearing to consider these issues and there was no indication that the court considered both Husband's and Wife's respective economic circumstances and each person's ability to pay his or her own appellate attorney fees, we concluded that the trial court had abused its discretion. Id.

Here, Father testified that he is a firefighter. Stepmother works at Eli Lilly and Company. However, as in both Allen and Bertholet, the trial court did not hold an evidentiary hearing to consider the resources of the parties, their economic condition, their ability to engage in gainful employment and earn adequate income, or any other factors that would bear on the reasonableness of the award. Under these circumstances, the trial court erred in ordering Mother to pay Father's attorney $5,000.

The judgment of the trial court is affirmed in part and reversed in part.

KIRSCH, J., and BROWN, J., concur.